# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

TERRY SIMPSON,          )
                       )
        Plaintiff,     )
                       )    No. 17-cv-2299
     v.               )
                       )    Magistrate Judge Susan E. Cox
NANCY A. BERRYHILL, Deputy   )
Commissioner for Operations for the Social  )
Security Administration,       )
                       )
        Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Terry Simpson ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability insurance benefits ("DIB") under Title II and Title XVI of the Social Security Act. The Parties have filed cross motions for summary judgment. For the reasons detailed below, the Commissioner's Motion for Summary Judgment (dkt. 17) is granted and Plaintiff's motion (dkt. 12) is denied.

## I. Background

### a. Procedural History and Plaintiff's Background[1]

On November 14, 2012, Plaintiff applied for Title II disability insurance benefits and Title XVI supplemental security income, alleging disability since June 15, 2007. (Administrative Record ("R.") 272-84). Plaintiff's claim was denied initially and again at the reconsideration stage. (R. 135-144; 1-6). Plaintiff timely requested an administrative hearing, which was held on March 31, 2015 before Administrative Law Judge ("ALJ") Michael G Logan. (R. 148; 52-100). Plaintiff was represented by counsel, and both a Medical Expert ("ME") and a Vocational Expert ("VE") testified during the hearing. (R. 52-100). On September 25, 2015, the ALJ issued a written decision denying Plaintiff

---

[1] With respect to Plaintiff's background and medical history, the Court finds the ALJ's recitation of these facts to be a largely thorough and accurate summary, and thus has adopted significant portions of the ALJ's synopsis.

disability benefits and supplemental security income. (R. 17-37). On January 19, 2017, the Appeals Council denied Plaintiff's appeal, and the ALJ's decision became the final decision of the Commissioner. (R. 1-6). Plaintiff filed the instant action on March 27, 2017. (Dkt. 1). The record contains no medical evidence prior to 2011.

Plaintiff was 55 years old at the onset date of disability, and did not complete high school (he has no more than a ninth grade education). (R. 55, 57, 665). He last worked in 2005, as a box loader and machine operator and repairer. (R. 58).

Plaintiff first filed his application for benefits on November 14, 2012. Shortly thereafter, on November 30, 2012, he sought treatment at Cook County's Near South facility ("Near South") alleging a myriad of physical disorders but no mental health symptoms aside from a diagnosis of alcoholism. (R. 415). Plaintiff next was seen on January 7, 2013 for back and arthritis pain, where he reported a past diagnosis of hypertension but noted that he had been off hypertension medication for a year. (R. 438, 440). He was started on medication for his elevated blood pressure on that occasion and his reports of the prior diagnosis. (R. 20). He was referred for imaging based on complaints of knee pain and back pain but results were normal. (R. 20, 441). Notably, there is no suggestion of mental health complaints or substance abuse at this time, nor is there any suggestion of abnormal mental health observations. (R. 415, 438-441). Although there is no work up for asthma, Plaintiff's reports of a prior asthma diagnosis are credited and he is prescribed an inhaler (R. 415, 440).

Plaintiff appeared for a consultative internal medicine examination on January 10, 2013 with Liana Palacci, D.O. of Disability Determination Services ("DDS") (R. 421-25). At this time, Plaintiff admitted to use of beer and whiskey, and alleged that he quit use of marijuana and cocaine in 2012. (R. 421). He acknowledged being in rehab for substance abuse in the 1990's. *Id.* Plaintiff claimed he was diagnosed with asthma and COPD in the 1980's, yet also reported smoking 2½ packs of cigarettes per day for the prior 40 years. (R. 421-22). He reported low back pain since the age of 13 with numbness and weakness in the right leg. (R. 422). He reported a stroke in 2001 with left sided hemiparesis and

reported attending of physical rehabilitation for several months. *Id.* He also alleged experiencing a "mild heart attack" in 1982 with chest pain for the prior 3 months. *Id.* On examination, Plaintiff's blood pressure was not remarkable. *Id.* Lungs were clear. *Id.* His grip strength was 4+/5, and Dr. Palacci noted that this was due to poor effort on Plaintiff's part. (R. 423). He presented with some reduced range of motion but had negative straight leg raise testing, no loss of sensation, and full 5/5 strength. (R. 423-24). On mental status examination, Plaintiff was alert and oriented. (R. 424). He had normal affect, knew who the President was, and could perform simple arithmetic. *Id.* Dr. Palacci's clinical impressions were that Plaintiff had well-controlled asthma and COPD; complaints of low back pain; history of stroke with no residual weakness; and history of coronary artery disease with complaints of chest pain that appear atypical. *Id.*

On March 12, 2013, Plaintiff appeared at Near South for a prescription medication follow-up. (R. 460-63). Plaintiff had good grip strength on examination despite alleging numbness, and there were no diagnostic findings supportive of neuropathy. *Id.* Plaintiff reported chronic hand numbness that comes and goes and has been present for several months. (R. 479). Plaintiff's allegations of arm and hand numbness were considered to possibly be related to neuropathy from long-term alcoholism or a Vitamin B deficiency. (R. 461, 480).

On April 24, 2013, Plaintiff went to the Provident Hospital outpatient clinic asking for a psychiatric referral. (R. 475-78). He claimed that he "sometimes hears voices" and that he was on medication (presumably psychiatric medication) a long time ago. (R. 475). He reported "jumping muscles" in his arms and occasional dizziness. *Id.* He also reported use of hypertension medication. *Id.* Although Plaintiff complained about his knees, back, and cervical spine, imaging studies from around that time of the cervical spine and knees were normal (R. 436-37, 478). The Plaintiff was given a psychiatric referral at his request and advised to return in one to two months. (R. 476, 478).

On July 5, 2013, Plaintiff returned to Near South for a prescription refill and also complained of right shoulder pain. (R. 482-84). It was noted that imaging studies (CT and x-ray) taken within the prior

5-6 months were normal. *Id.* Examination did not show any significant deficit and grip strength was largely unimpacted. (R. 483-84). At his July 9, 2013 follow-up, Plaintiff again complained of right upper extremity deficit, some chest pain, and instances of his legs giving out, all without objective confirmation. (R. 485-491). He was started on medication for neuropathic pain. (R. 487, 490). At this time, he also reported visual hallucinations at night/seeing dead people; he conversed with them, but they were not threatening or disturbing. (R. 487). He stated that sometimes he feels held down to his bed. *Id.* He further reported some non-threatening auditory hallucinations during the day. *Id.* Despite the fact Plaintiff claimed not to be using alcohol at this time, his doctor opined, relative to Plaintiff's allegations of anxiety and hallucinations, that Plaintiff's alcohol use was likely worsening. (R. 487, 491). There was no mention of drug use. (R. 485-491). Despite his contentions of no current alcohol use, alcoholism remained an active diagnosis and Plaintiff was advised to quit. (R. 490).

On July 29, 2013, Plaintiff appeared before psychiatrist Regina Hall-Ngorima ("Dr. Ngorima") for a new patient evaluation. (R. 661-66). Dr. Ngorima noted that Plaintiff's last psychiatric visit was 10 years ago. (R. 662, 664). Plaintiff's living situation was somewhat tenuous: he reported he had lost his apartment last year and that he had been living with his daughter for the prior two weeks. (R. 662, 665). Plaintiff alleged ongoing auditory and visual hallucinations (reportedly since childhood but worse as an adult), past suicidal attempt/ideation,[2] and paranoia but mostly when he drinks. (R. 662-63). He reported feeling like something was holding him down in bed, so he sleeps sitting up. (R. 662). He reported that he is always fighting and arguing and that he drinks to stay calm. *Id.* He acknowledged daily drinking with occasional withdrawal symptoms, and regular marijuana and occasional crack use.[3] (R. 665). He was given a diagnosis of manic-depressive psychosis, but no diagnosis of substance abuse (although alcoholism is listed on the "problem list" as a past diagnosis). (R. 663, 665). He was advised

---

[2]    Dr. Ngorima's psychiatric records report a history of 4 suicide attempts: 1 attempt with a gun a month prior (R. 662, 664), and 3 overdoses (R. 664) although the substance(s) on which Plaintiff overdosed is not specified. Dr. Ngorima found Plaintiff non-suicidal at the time of her evaluation. (R. 665).

[3]    Plaintiff reported his alcohol use as a pint and a 6-pack daily; he reported his drug use as occasional crack usage and marijuana usage 3 days a week (R. 665).

to continue with his previously prescribed Notriptyline and he was started on started Risperdal nightly for psychosis. *Id.* Based on this initial assessment, Dr. Ngorima provided Plaintiff with a Global Assessment of Functioning ("GAF") score of 45, indicative of serious symptoms.[4, 5] *Id.*

Plaintiff returned to Dr. Ngorima on August 26, 2013. (R. 655-60). Plaintiff reported continued symptoms and a negative reaction to Risperdal; his mood was depressed and angry, but his affect and thought process was normal. (R. 656, 659). He reported that his daughter had kicked him out because he was talking to himself and throwing things when angry. (R. 656). Although Dr. Ngorima had diagnosed Plaintiff with manic-depressive psychosis both in the month prior and on this visit, she now suggested that he was previously diagnosed with schizoaffective disorder bipolar type. (R. 656, 659, 665). In addition to previously prescribed medications, Plaintiff was started on Seroquel and Quetipine in place of the Risperdal. (R. 659-60). Plaintiff's reported substance use remained unchanged. (R. 658). There was still no diagnosis of substance abuse by Dr. Ngorima. (R. 659).

Plaintiff's next visit with Dr. Ngorima was on October 7, 2013. (R. 649-54). Plaintiff reported some decrease in symptoms but that he was still "fussing and fighting" with family members. (R. 650). He had been living at his brother's house for the prior three weeks, but reported that he would have to move soon due to a foreclosure. *Id.* He still had some auditory and visual hallucinations, but reported that he had them less now that he was sleeping better. *Id.* He reported that he'd had suicidal thoughts two weeks prior but did not attempt to harm himself. *Id.* Alcohol is reported as being used daily; there is no diagnosis of substance abuse but it remained on the "problem list". (R. 651, 653). The remainder of the notes related to this visit were largely consistent with prior visit. (R. 649-54). At his December

---

[4]     Although the Global Assessment of Functioning ("GAF") is not used in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM V"), it was used in the previous version of that text ("DSM IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See Steele v. Colvin*, 2015 WL 7180092 at *1 (N.D. Ill. Nov. 16, 2015). The lower the GAF score, the greater the degree of impairment. *Id.* A score between 41 and 50 indicates "serious symptoms" such as suicidal ideation, severe obsessional rituals, or frequent shoplifting or "any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work)." A score between 51 and 60 represents "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* Anything above 60 would indicate mild symptoms. *Id.*

[5]     Plaintiff's GAF score was repeated throughout his treatment records, although there is no evidence Dr. Ngorima ever reassessed Plaintiff's GAF. (R. 22, 611-66).

16, 2013 follow up, Plaintiff admitted that he last filled meds in October and had been without medication for six weeks, so he was restarted on medication including Zoloft. (R. 644, 647). He reported some continued but decreased hallucinations and was back to living with his daughter. (R. 644). He described himself as stressed due to lack of income and frequent moves. *Id.* There was no change in reported substance use or substance use history, nor was there a diagnosis of alcoholism by Dr. Ngorima. (R. 647).

On January 21, 2014, Plaintiff appeared as a new patient before Dr. Chukwudozie Ezeokoli. (R. 499-503). Plaintiff again complained of "jumping muscles" and spasms/cramps in his right arm (R. 500). Plaintiff's neurological findings were unremarkable. (R. 502). Although no abnormal mental health findings were noted, Plaintiff appears to have been credited with schizoaffective disorder/bipolar disorder and advised to continue with previously prescribed Sertraline[6] and Seroquel. (R. 503). Despite the record indicating that alcoholism was one of Plaintiff's chief complaints on that day, Plaintiff contended that he had quit using alcohol four months ago. (R. 499-500). This appears to be Plaintiff's only visit with Dr. Ezeokoli.

Plaintiff continued to complain of varied physical upper extremity pain and neuropathy at a Near South follow-up on February 20, 2014. (R. 491-96). However, Plaintiff's EMG results were normal, showing "no electrophysiologic evidence of peripheral neuropathy or cervical radiculopathy." (R. 495). The record reflects two different notations about Plaintiff's alcohol use on this visit: he told his doctor both that he quit drinking alcohol, and that he drinks a 6-12 pack a day or two 20-oz beverages. (R. 494-96). Plaintiff did not allege any mental health issues on this occasion, and Plaintiff's doctor noted that Plaintiff's anxiety and hallucinations were better on his current medications and his reports of alcohol cessation. (R. 496).

On March 10, 2014, Plaintiff returned to Dr. Ngorima with his disability paperwork. (R. 638). He alleged on this occasion that his medication was not working. *Id.* He reported that he was living

---

[6]    There is no record that Sertraline had been previously prescribed for Plaintiff. (R. 22, 500-01).

with a different daughter after getting into a fight with the prior daughter's boyfriend. *Id.* He again reported suicidal ideation via a gun, but claimed the gun was taken away. *Id.* He described himself as more irritable, more depressed, and getting little sleep. *Id.* Although he appeared angry and depressed on examination, Dr. Ngorima found no objective evidence of delusions or behavioral abnormality and he was considered to be relaxed, cooperative and stable. (R. 641). His diagnosis was listed as manic depressive psychosis with antisocial traits and both his Seroquel and Zoloft were increased in dosage. (R. 641-42). There was no change to his substance abuse history or suicide attempt history. (R. 641). There was no diagnosis of alcoholism by Dr. Ngorima, although it remained on the "problem list." (R. 640-41).

At Plaintiff's June 2014 follow-up at Near South, Plaintiff reported he stopped drinking alcohol six months prior. (R. 559). This record makes no mention of Plaintiff's drug use. (R. 558-66). His mood was considered to be more stable and although he reported some nighttime visual hallucinations and daytime auditory hallucinations, they were not threatening but he sometimes felt held down to his bed. (R. 559). Physical examination was again largely unremarkable, and the record again reflects that his mental health symptoms had improved with his current medication regimen. (R. 565).

However, at his June 2, 2014 follow up with Dr. Ngorima, Plaintiff alleged continued mental health symptomology, including violent behavior, despite reporting that he was compliant with medication (R. 631). Plaintiff's medication dosage was increased again. (R. 636). Alcoholism remained on the "problem list" but was still not a current diagnosis, yet Plaintiff's alcohol and drug usage report remained unchanged from his first appointment with Dr. Ngorima (*i.e.*, a pint and a 6-pack of alcohol daily; occasional crack use; marijuana use 3 days a week). (R. 632, 634, 636). Plaintiff's objective examination was largely consistent with prior findings. (R. 630-36).

At his August 11, 2014 psychiatric follow up, Plaintiff reported that he was drinking a couple times each week, having about two beers each occasion; he had not used marijuana in months; and he had not used crack cocaine "recently," as his daughter did not allow it in the house. (R. 625). Plaintiff

reported continued mental health symptoms, such as fighting with family, not sleeping well, and hallucinations. *Id.* Plaintiff also reported that he thinks of suicide often; he reported that he took a large amount of pills two weeks prior and his daughter made him throw them up. *Id.* Despite this, Dr. Ngorima made no change to Plaintiff's suicide attempt history. (R. 628; *see also*, fn. 2, *supra*). Plaintiff's prescription for Zoloft, however, was increased due to his depression. (R. 629).

On December 4, 2014, Plaintiff appeared for a consultative psychological assessment with State agency consultant Mark Langgut, Ph.D. (R. 569-72). On the date of the assessment, Plaintiff had been without medication for at least two months, but did not report this to Dr. Langgut. (R. 618; 570). Dr. Langgut noted that Plaintiff "had an agenda and was only fairly cooperative in responding to questions during examination." (R. 571). Plaintiff claimed he was "seeing, hearing things…people talking to me. I can't stand small spaces." (R. 569). Plaintiff traveled to the testing site independently, but he reported that he did not know the directions taken to the site. (R. 569, 571). Plaintiff suggested that he could not remember his age, and could not remember if he had siblings; Plaintiff claimed to have eleven children (but could not recall their names or ages, despite elsewhere indicating he was in recent contact with five of them and had recently lived with 3 of them, including currently living with one of his daughters). (R. 570-71). He admitted to watching television and going out walking during the day. (R. 570). He further suggested he essentially allows others to complete most activities of daily living that he benefits from, such as cooking, cleaning, etc. *Id.* Plaintiff's emotional presentation was variable throughout the interview, and he often displayed emotions inappropriate to the situation; he reported that he easily becomes mildly angered, and Dr. Langgut found him to have poor coping skills. (R. 571). Plaintiff told Dr. Langgut he has had hallucinations of mild intensity all his life, and that they were auditory, visual, olfactory, tactile, and gustatory in nature. (R. 572). Plaintiff reported moderate depression, indicating that he was upset that he did not have his own place, yet he claimed he did not know when he first became depressed. (R. 751). Dr. Langgut found no behavioral abnormalities, and no indications of mania or anxiety. *Id.*

Dr. Langgut noted Plaintiff's history of chronic alcoholism, with recent reported remission, which was described by Dr. Langgut as a "tenuous state of abstinence from substances." (R. 570, 572). Plaintiff reported to Dr. Langgut that he was drinking daily by the age of 20, yet had stopped five or six months earlier due to headaches. (R. 570). Plaintiff does not attend AA meetings. *Id.* He also admitted to drug abuse from the age of 15 onward using "anything there was" (primarily cocaine and marijuana), but he suggested that he stopped two years earlier, for unclear reasons. *Id.* He also claimed to be down to smoking only five to ten cigarettes daily (prior reports by Plaintiff were rather consistently at 1-2 packs a day). *Id.* Ultimately, Dr. Langgut diagnosed Plaintiff with: Alcohol Abuse - in recent remission; Polysubstance Abuse - in recent remission; and Substance-Induced Mood Disorder, N.O.S. (R. 572).

Plaintiff returned to Dr. Ngorima for follow-up on December 29, 2014, where he reported continued mental health symptoms but also admitted that he had been without medication for three months. (R. 618). He denied current drug or alcohol use (yet elsewhere this record indicates Plaintiff was drinking 1-2 beers twice weekly with occasional withdrawal symptoms). (R. 618, 621). He was restarted on medication. (R. 622).

Plaintiff returned to the Near South facility on February 4, 2015, but left without being seen.[7] (R. 598).

On February 9, 2015, Plaintiff attended a second consultative internal examination, this one by Dr. Joseph Youkhana. (R. 580-89). Plaintiff now denied any prior heart attack and failed to allege stroke, but did claim hypertension, right arm numbness, and back pain secondary to a childhood injury. (R. 580). Plaintiff told Dr. Youkhana that he only occasionally drank alcohol in the last year, despite being a heavy drinker in the past for many years. (R. 581). He told Dr. Youkhana he had not used drugs in the last year, but prior to that he used marijuana and cocaine. *Id.* Plaintiff reported a history of asthma with inhaler use and also reported continued cigarette smoking, at 4 cigarettes per day. (R. 580-

---

[7]    The record does not indicate why Plaintiff left, but it is clear Plaintiff waited 90 minutes past his scheduled appointment time without being seen (and nearly 2 hours past his arrival time at the clinic). (R. 598).

81). Lung examination showed only mild decrease in breath sounds with no wheezing or rattling sounds. (R. 581). Grip strength in both hands was 5/5 with normal ability in both fine and gross movements. *Id.* Bilateral knee flexion was 130/150. (R. 588). Range of motion in the lumbar spine was mildly limited, but all other joints had normal range of motion. Subsequent spirometry testing showed mild restriction. (R. 594-97). Similarly, x-ray examination showed only mild degenerative joint disease of the left knee and lumbar spine. (R. 592-93). On mental status examination, Plaintiff showed increased math capacity, recall of past presidents, and provided the names of some children. (R. 582). Dr. Youkhana diagnosed Plaintiff with: hypertension (blood pressure of 150/96, advised to see primary care doctor for better blood pressure control); history of asthma with shortness of breath; chronic back pain; and mental illness (unspecified). (R. 583).

Plaintiff had routine follow up with Dr. Ngorima on April 20, 2015. (R. 611-16). Plaintiff alleged that he did not feel his medication was working because he was still irritable and unable to sleep some nights, yet reported sleeping 7-8 hours most nights. (R. 612). Plaintiff's judgment and thought processes were appropriate, and he was not found to be depressed. (R. 615). He again denied drug or alcohol use, but this record also indicates Plaintiff was drinking 1-2 beers twice weekly with occasional withdrawal symptoms. (R. 612, 614). Dr. Ngorima added a trial of Depakote for mood stabilization to Plaintiff's previously prescribed medications. (R. 616). There is no evidence of subsequent follow-up.

At the March 31, 2015 administrative hearing, Plaintiff testified, *inter alia*, that he does not know the year his alleged stroke took place, but that he was normal and suffered no consequences from the stroke. (R. 76-68, 70). Plaintiff testified that he stopped/reduced his alcohol consumption because he "got tired of it" within the prior 12 months.[8] (R. 73-75). When asked to quantify his prior drinking, Plaintiff testified that for "years" he used to drink a half gallon of gin and a 12-pack of beer per day. (R.

---

[8]   The testimony is unclear whether Plaintiff ceased or reduced his alcohol consumption. (R. 73-75). The ALJ variously used the phrases "stopped," "stopped abusing alcohol," "reduced your alcohol use," "cut down," and "keep your consumption low," sometimes employing more than one phrase in the same question to Plaintiff concerning his alcohol use. (*Id.*; *see specifically* R. 73:11-12). However, Plaintiff admitted to still drinking alcohol on holidays. (R. 75-76).

73-74). Plaintiff testified that he drinks alcoholic beverages only on holidays now. (R. 75-76). Plaintiff testified that snorting cocaine was his drug of choice and he would consume one or two "dime bags" a week. (R. 75-76). He used to go to AA, but doesn't anymore. (R. 74-75). Plaintiff stated that his sleep was "restless," but when questioned further on this topic, Plaintiff stated that he slept all of the hours between bedtime and waking (from around 9:00 p.m./9:30 p.m. to 7:00 a.m.) and that he felt rested in the morning. (R. 83-84).

Also at the administrative hearing, the ME, Dr. James McKenna, M.D., who is board certified in internal medicine and pulmonary disease, testified that Plaintiff has a history of alcoholism, nicotine dependence, and although he has been prescribed an inhaler, asthma is not established in Plaintiff's medical records. (R. 86-94). Dr. McKenna noted that the results of a pulmonary function test in the record were inconsistent and that the Plaintiff gave poor effort during the test. *Id.* He noted that Plaintiff had been diagnosed with hypertension in the past but was not receiving medication at that time. *Id.* Dr. McKenna testified that x-rays of the Plaintiff's right shoulder and cervical spine, as well as a CT scan of the brain were largely normal. *Id.* There was some atrophy, but Dr. McKenna noted that this is not inconsistent with Plaintiff's high levels of alcohol consumption. *Id.* Dr. McKenna opined that Plaintiff's positive straight leg raise at his most recent internal medicine consultative examination did not correlate with his extensions, minimal decreases in range of motion demonstrated spinal range of motion, nor did decreased range of motion in the shoulder not correlate with any medically determinable impairment. *Id.* When questioned about Plaintiff's reported poor grip strength at his initial consultative examination, Dr. McKenna noted that poor effort on the part of the Plaintiff undermines the results. Dr. McKenna ultimately opined that Plaintiff has no severe physical impairment. *Id.*

Pam Tucker, the VE at the administrative hearing, testified, in significant part, that an individual in the competitive workforce cannot be off task for more than 15% of the workday. (R. 95). She testified, based on the hypothetical limitations provided by the ALJ, that not only could Plaintiff return to either of his former occupations of Cleaner or Machine Operator, but that the jobs of Packer,

Machine Feeder, and Lunch Worker also existed in significant numbers in the national economy and could be performed by Plaintiff. (R. 96-97).

At the conclusion of the hearing, the ALJ held the record open to allow for submission of outstanding mental health records. These records demonstrated a substantial prior history of drug and alcohol abuse, including every other day crack cocaine ingestion that Plaintiff did not acknowledge at the administrative hearing. (R. 31).

### b. The ALJ's Decision

The ALJ issued a written decision on September 25, 2015. (R. 17-37). The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2007. (R. 19). As there was no medical evidence prior to Plaintiff's date last insured ("DLI") of December 31, 2007, the ALJ found insufficient evidence of a disability prior to the DLI and denied Plaintiff's request for Title II disability benefits. (R. 20). The remainder of the ALJ's opinion dealt with Plaintiff's request for Title XVI supplemental security income benefits. *Id.*

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from the alleged onset date of June 15, 2007 through his DLI. *Id.* At step two, the ALJ concluded that Plaintiff had the severe impairments of: history of drug and alcohol abuse; depression; and substance-induced mood disorder. *Id.* In addition to these severe impairments, hypertension, mild degenerative disk disease, and mild left knee arthritis were determined to be non-severe. (R. 25). The ALJ also determined that Plaintiff's allegations of asthma, COPD, low back pain, shoulder arthritis, history of stroke, and history of coronary artery disease did not correspond with medically determinable impairments, as there were no abnormalities related to these allegations shown by medically acceptable clinical and laboratory diagnostic techniques. *Id.*

At step three, the ALJ concluded Plaintiff did have an impairment, including substance use disorders, that met Listings 12.04 and 12.09. *Id.* The ALJ found that Plaintiff satisfied the "Paragraph A" criteria because Plaintiff had medically documented persistence of depressive syndrome

characterized by sleep disturbance, psychomotor agitation, difficulty concentrating, and hallucinations, and he had been variously diagnosed with bipolar syndrome. *Id.* The ALJ found that Plaintiff satisfied the "Paragraph B" criteria because Plaintiff's mental impairments, including substance use disorders, caused at least two "marked" limitations in Plaintiff's life, those marked limitations being in social functioning and concentration, persistence, or pace. (R. 26). The ALJ also noted that although Plaintiff "provided innumerable conflicting statements regarding the frequency and duration of his alcohol and drug use as well as varied claims regarding when he reportedly stopped use…medical evidence shows ongoing use in conjunction with increased symptomology." *Id.* Ultimately, the ALJ found that "when [Plaintiff] is using drugs, his condition is deteriorated such that he meets listing level." *Id.*

The ALJ then detailed the weight he gave to the medical opinions in this matter, and his reasoning for such weight, as follows:

- The ALJ gave good weight to the opinion of Plaintiff's treating psychiatrist, Dr. Ngorima, as her opinion addressed Plaintiff's functioning in conjunction with ongoing substance abuse. (R. 26-27). Although Dr. Ngorima failed to acknowledge Plaintiff's ongoing substance abuse at the time of her assessment (instead crediting the non-credible statements of Plaintiff denying use),[9] her opinion showing marked deficits in functioning supported the finding that Plaintiff is disabled and ultimately satisfied Listing severity in conjunction with his substance abuse; the ALJ noted that this was demonstrated by other medical evidence during the relevant time period. *Id.* However, the ALJ gave slight weight to Dr. Ngorima's finding as it pertains to Plaintiff's functioning in the absence of substance abuse as the record did not detail credible substance abstinence during periods of increased symptomology. (R. 34). The ALJ noted that "[a]lthough there are periods in which substance abuse is not reflected and [Plaintiff's] functioning is improved, suggestions of hallucinations and psychosis occur in conjunction with extended substance use (and in the absence of demonstrated abstinence)." *Id.* The ALJ highlighted that Plaintiff's reported symptoms were all made in the context of Plaintiff pursuing his disability claim after his claim was denied initially. *Id.* Moreover, as Plaintiff's mental allegations were "primarily in the context of rampant daily ingestion of street drugs and alcohol," the ALJ gave only good weight to the GAF score of 45 as it pertained only to Plaintiff's functioning in conjunction with substance use and was not consistent with the longitudinal record (nor was the GAF score ever reassessed). (R. 22, 34).

- The ALJ gave moderate weight to the medical source statement of Dr. Langgut, as it related

---

[9]   For instance, the ALJ called into question Dr. Ngorima's reliance on Plaintiff's reports of reduced alcohol consumption when, on April 20, 2015 he reported that he was still drinking one or two beers twice weekly and experiencing occasional alcohol withdrawal symptoms, yet Dr. Ngorima did not question him as to how he continues to experience withdrawal symptoms while reporting minimal alcohol use for an extended period. (R. 33).

to the Plaintiff's functioning in conjunction with substance use. (R. 27, 34). Although Dr. Langgut's opinion was not clearly indicative of disabling restriction, the ALJ determined that his opinion showed several extreme and marked deficits and his diagnosis all reflected substance related conditions/restrictions. (R. 27). The ALJ held that because Dr. Langgut's deficits were based on the diagnosis of substance-related disorders, they offered limited insight into Plaintiff's functioning absent substance use. (R. 34-35).

- The ALJ gave slight weight to the opinion of the State agency mental health consultants who opined that Plaintiff had no medically determinable mental health impairment, as they did not have the opportunity to review the entirety of the longitudinal record or to examine or treat the Plaintiff. (R. 27, 35). The ALJ noted that although these opinions were not inconsistent with the objective evidence present in the record at the time of analysis, he pointed out that subsequent evidence demonstrated greater deficits. *Id.*

- In relation to Plaintiff's alleged physical impairments, the ALJ gave great weight to the opinion of Dr. McKenna, the ME who testified at the administrative hearing, that Plaintiff has no severe physical impairment. (R. 27). The ALJ noted as favorable the fact that the ME had the opportunity to review the entirety of the longitudinal record; observe and hear the Plaintiff testify under oath at hearing; occupy a position of complete neutrality; and he had rendered an opinion as a well-qualified, experienced forensic doctor in Social Security disability cases. *Id.* The ALJ also noted that the ME's opinion was supported by the longitudinal record and treatment actually received by Plaintiff. (R. 27, 33-34).

- The ALJ gave great weight to the opinion of the State agency physical consultant opined that no severe physical impairment was demonstrated by the evidence, as it was consistent with both the opinion of the ME and the longitudinal record. The ALJ then noted the caveat that he found the classification of degenerative disc disease as severe in a check box category to be entitled to little weight as he believes it was made in error given the remainder of the opinion. (R. 27, 34).

The ALJ then found that if Plaintiff stopped his substance use, his remaining limitations would cause more than a minimal impact on his ability to perform basic work activities; therefore, Plaintiff would continue to have a severe impairment or combination of impairments. *Id.* However, these impairments would not meet or medically equal any of the impairments (including Listings 12.04 and 12.09) listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. 28-29).

Specifically, with respect to the "Paragraph B" criteria, the ALJ determined that Plaintiff would have only mild restriction in activities of daily living in absence of substance use. (R. 28). The ALJ noted that Plaintiff takes care of his personal hygiene and that he can go out alone without his children and attended nearly all medical appointments unaccompanied. *Id.* He watches television and takes walks. *Id.* He is able to shop in stores and to prepare meals, despite allowing others to perform most

activities of daily living that he benefits from, such as cooking, cleaning, etc. (R. 24, 28). The ALJ again noted that he found Plaintiff not credible in regards to allegations of reduced functioning in this area when not using drugs or alcohol. (R. 28). In the social functioning arena, the ALJ found that Plaintiff would have moderate difficulties after cessation of substance abuse because Plaintiff testified that he gets agitated easily when off medications, yet when he takes his medications, he does not get upset. *Id.* The ALJ noted that Plaintiff's medical records reflected some continued irritableness and that he was "easily angered," but noted that no objective behavioral disturbances were ever observed, nor was Plaintiff ever referred for psychiatric hospitalization or more intensive treatment. *Id.* With regard to concentration, persistence, or pace, the ALJ found that Plaintiff would have moderate difficulties if the substance use were stopped. *Id.* Although Plaintiff reported some poor sleep (improved with medication compliance) and poor concentration, his treating source found normal thought processes, with no objective verification of any hallucinations or delusions. *Id.* The ALJ determined that Plaintiff had experienced no episodes of decompensation in the past, nor would he if he stopped substance use. (R. 26, 28). Thus, the "Paragraph B" criteria were not satisfied. (R. 28).

With respect to the "Paragraph C" criteria, the ALJ determined that Plaintiff's conditions did not satisfy these criteria either in the absence of substance abuse. (R. 28-29). Plaintiff's depression did not meet any of the "Paragraph C" criteria, nor had there been any repeated or extended episodes of decompensation. *Id.* Plaintiff indicated a sufficient adaptability to maintain extensive daily activities and is able to function outside of his home. *Id.*

Prior to step four, the ALJ found that through his DLI, Plaintiff maintained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: maintain concentration leading to on task productivity with a moderate limitation (which the ALJ pegged as a residual 90% of the workday); work with occasional contact with coworkers and supervisors and no public contact; take public transportation, feed, dress, bathe himself and engage in personal hygiene work without work attendance deficits. (R. 29).

In making this finding, the ALJ determined Plaintiff's general credibility to be undermined, and engaged in a nearly 12-page single spaced analysis of Plaintiff's administrative hearing testimony and Plaintiff's credibility. (R. 30-33). The ALJ noted that Plaintiff initially alleged he was disabled exclusively on physical allegations,[10] but only after denial was issued at the initial level did Plaintiff begin to allege mental health symptomology. (R. 29-30). Plaintiff did not allege significant mental health symptoms at the time of his consultative examination in 2013 or in his initial application for benefits (he suggested only talking to himself); yet a little over eight months later (and after the denial), he alleged a host of mental maladies, including that he was depressed, irritable, suicidal, hopeless, feeling down and out, having auditory hallucinations/commands to harm himself and others, visual hallucinations of deceased friends and family, and paranoia, "mostly when he drinks." (R. 32, 663).

The ALJ also found Plaintiff less than truthful about his extensive substance abuse history. (R. 30, 23). In particular, the ALJ was skeptical of the fact Plaintiff "continued to report high-end ingestion of drugs and alcohol until August 2014 (and thereafter asks that we presume he essentially went cold turkey without assistance)." (R. 32, 34). The ALJ noted that since the 2013 consultative examination, Plaintiff "continued to provide inconsistent statement[s] regarding his substance abuse and abstinence which undermine his credibility." (R. 32). The ALJ found that Plaintiff minimized his substance abuse at the administrative hearing, yet the post-hearing records indicated he had periods of every other day crack cocaine ingestion. *Id.* The ALJ found Plaintiff's mental health symptomology significantly varied and consistent with periods of increased substance use, and that when Plaintiff reported reduced use, this was consistent with higher levels of functioning. *Id.* The ALJ notes that by August 11, 2014, when Plaintiff reports he is down to using alcohol two times a week, his functioning shows some improvement. (R. 33). However, he then experienced extended medication noncompliance issues, where he was off his medications for three months. *Id.* The ALJ also reduced Plaintiff's

---

[10]  Plaintiff alleged disability based on back problems, arthritis, hypertension, bronchitis, stroke (effects on left side), dizziness, and a heart condition. (R. 125). The ALJ noted that the evidence is not indicative of any severe physical impairment for these ailments. (R. 29-30).

credibility because he gave poor effort on his mental status examination before Dr. Langgut in December 2014, demonstrating an inability to answer questions that he responded to easily in the past. (R. 35).

The ALJ found Plaintiff not credible with regards to his physical injuries as well, as he alleged significant physical complaints of pain and weakness with no medical basis for the same. (R. 34).

As part of the Plaintiff's RFC, the ALJ found that Plaintiff was able to maintain on-task productivity for at least 90% of the workday, and detailed his reasoning for this figure as follows:

> By definition "marked" means "more than moderate but less than extreme". A marked limitation may arise when several activities or functions are impaired or even when only one activity is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. A moderate limitation in concentration, persistence or pace does not preclude work on a full-time, competitive basis. On the other hand, a marked limitation in concentration, persistence or pace does preclude work on a full-time, competitive basis. The vocational expert at hearing indicated that, in vocational terms, more than a residual of 85% concentration, persistence or pace for the workday does not preclude work on a full-time competitive basis and that less than a residual of 85% concentration, persistence or pace for the workday does preclude work on a full-time, competitive basis. I am finding that the [Plaintiff] has a moderate limitation in concentration, persistence or pace, and, therefore, I articulated to the vocational expert witness that [he] is able to maintain concentration leading to on task productivity 90% or more of the workday in the residual functional capacity hypothetical to reflect that residual capacity in vocational terms.

(R. 35).

The ALJ further noted that the RFC findings reached by the DDS physicians also support the finding Plaintiff is not disabled, "particularly in a case like this in which there exist a number of other reasons to reach similar conclusions." (R. 35).

At step four, the ALJ concluded that if Plaintiff ceased substance use, he would be able to perform his past relevant work as Cleaner and Machine Operator, as neither job requires the performance of work-related activities precluded by Plaintiff's RFC in the absence of substances. *Id.* The ALJ also made alternative vocational findings at step five, and relied upon testimony from the VE in concluding that there were the following additional jobs that existed in significant numbers in the national economy that Plaintiff could perform: Packer, Machine Feeder, and Lunch Worker. (R. 35-36).

Because of this determination, the ALJ found Plaintiff not disabled under the Act and noted that substance use disorder is a contributing factor material to the determination of disability. (R. 36).

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In the instant matter, the ALJ must also conduct a Drug Addiction and Alcoholism ("DAA") analysis pursuant to SSR 13-2p. Although there is painfully little guidance as to the interplay of the regular five step disability analysis and the six step analysis set out in SSR 13-2p[11] (2013 WL 621536, at *5 (Feb. 20, 2013)), we find persuasive the thoughtful and reasoned approach set forth in *Hundley v. Colvin*, 2016 WL 423548 (D.S.C. Jan. 12, 2016), setting forth that an ALJ should conduct the regular

---

[11] The six step DAA analysis is set forth within the block quote in Section III(a), *infra*.

five-step disability inquiry before engaging in the DAA materiality analysis asking whether alcohol and substance abuse is a contributing factor material to the determination of disability. Specifically,

> before evaluating whether polysubstance abuse is a contributing fact[or] to a finding of disability, the ALJ must first conduct the regular five-step disability inquiry to determine if a claimant is disabled, including as part of this inquiry the impact of any alcoholism or drug addiction. It is only after that point, if the ALJ finds that the claimant is disabled and there is "medical evidence of drug addiction or alcoholism," that the ALJ then proceeds under § 404.1535 to determine whether the claimant "would still [be found] disabled if [he or she] stopped using alcohol or drugs." Stated another way, if the ALJ finds that a Plaintiff's condition is disabling, he is then required to determine whether the Plaintiff's alcohol and substance abuse was a contributing factor material to the determination of disability, as disability due to drug addiction and alcoholism is not a proper basis for an award of benefits under the Social Security Act if the addiction is a contributing factor material to the determination of disability.

*Hundley*, 2016 WL 423548, at *5 (D.S.C. Jan. 12, 2016) (citing, *inter alia*, 20 C.F.R §§ 404.1535, 416.935; *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir.2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (other citations and signals omitted)). While the claimant bears the burden of proving that alcoholism or drug addiction is not a contributing factor material to his disability, the ALJ must still "adequately disentangle" the effects of a claimant's substance abuse from those of his other impairments. *Harlin v. Astrue*, 424 Fed. Appx. 564, 567-68 (7th Cir. 2011).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). Even where "reasonable minds

could differ" or an alternative position is also supported by substantial evidence, the ALJ's judgment must be affirmed if supported by substantial evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Scheck*, 357 F.3d at 699. On the other hand, the Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535,539 (7th Cir. 2003); *see also*, 42 U.S.C.§ 405(g).

## III. Discussion

The Plaintiff does not challenge the ALJ's denial of Title II benefits. With respect to his Title XVI benefits, Plaintiff alleges the ALJ made four errors: 1) that the ALJ failed to conduct a proper DAA analysis; 2) that the ALJ erred in his credibility analysis; 3) that the ALJ made an error in failing to defer to a treating physician's opinion; and 4) the ALJ erred in his RFC assessment. The Court addresses each of these issues in turn.

### a. The ALJ Conducted a Proper DAA Analysis Under SSR 13-2p

Social Security Ruling 13-2p governs the evaluation of cases involving drug addiction and alcoholism. With respect to a disability claimant with a substance use disorder, "[a]n individual shall not be considered to be disabled for purposes [of the Social Security Act] if alcoholism or drug addiction would…be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). "When an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006). If drug or alcohol use is material to the claimant's disability, the claimant is found not disabled. SSR 13-2p. As mentioned, while the claimant bears the burden of proving that alcoholism or drug addiction is not a contributing factor *material* to his disability, the ALJ must still "adequately disentangle" the effects of a claimant's substance abuse from those of his other impairments. *Harlin*, 424 Fed. Appx. at 567-68 (emphasis added).

Plaintiff does not take issue with steps one through three of the ALJ's SSR 13-2p DAA analysis.

(Dkt. 13, p. 8). Plaintiff takes issue with the ALJ's DAA analysis at steps four, five, and six (and the fact that the ALJ did not specifically reference SSR 13-2p). However, this argument by Plaintiff ignores that the six step DAA analysis set forth in SSR 13-2p is sequential.[12] If Plaintiff cannot get past step four, no step five analysis is needed; if Plaintiff cannot get past step five, no step six analysis is needed.

In this case, the ALJ did not err in his DAA analysis under SSR 13-2p. Yes, the ALJ could have actually referenced SSR 13-2p and numbered the steps of his DAA analysis under SSR 13-2p, but his failure to do so does not mean he did not conduct a proper DAA analysis under the Regulation. Rather, the ALJ adequately addressed the "materiality" of Plaintiff's DAA as required by SSR 13-2p. As stated above, materiality is the key factor in a DAA analysis, as is clear from SSR 13-2p itself and the cases in this district and within our circuit that have dealt with the relatively new (*i.e.*, 2013) SSR 13-2p regulation. SSR 13-2p, 2013 WL 621536, at *5 (Feb. 20, 2013) ("We describe various considerations that may apply when we decide whether we must consider the issue of materiality and, if so, whether DAA is material to the determination of disability."); s*ee also, Negron v. Colvin*, 2017 WL 985642, at *6 (N.D. Ill. Mar. 14, 2017) ("If drug or alcohol use is material to the claimant's disability, the claimant is found not disabled."); *Barrett v. Berryhill*, No. 16 CV 50257, 2017 WL 3142563, at *2 (N.D. Ill. July 25, 2017); *Hawkins v. Colvin*, 2015 WL 1486795, at *5 (N.D. Ind. Mar. 31, 2015); *Totman v. Colvin*, 2015 WL 1137431, at *1 (W.D. Wis. Mar. 12, 2015) ("the ALJ's decision addressed whether plaintiff's DAA was a contributing factor material to his disability, thus following the applicable regulations as well as the underlying logic of SSR 13–2p."); *Coleman v. Berryhill*, 2017 WL 6628559, at *5 (S.D. Ind. Dec. 6, 2017); *Beerman v. Colvin*, 2016 WL 922874, at *7 (N.D. Ind. Mar. 11, 2016); *Motley v. Colvin*, 2016 WL 5349496, at *fn. 11 (N.D. Ind. Sept. 26, 2016).

---

[12]  The Regulation states that "[a]lthough the steps are in a logical order from the simplest to the most complex cases, we do not require our adjudicators to follow them in the order we provide. For example, when DAA is the only impairment adjudicators can go directly to step three and deny the claim because DAA is material." SSR 13-2p, 2013 WL 621536, at *5 (Feb. 20, 2013). Despite this language, SSR 13-2p sets forth a sequential analysis that must be followed; although SSR 13-2p allows an ALJ to start at step three of the process if DAA is the only impairment, it would be wholly illogical to proceed with the steps in anything but an ascending numerological order no matter what step the ALJ started at. You cannot go backwards in the steps as each step directs the ALJ to the next numerical step.

While it is plain materiality is the key factor of SSR 13-2p, the *Hundley* case (*see* Section II, *supra*) describes the six DAA steps as they are laid out in SSR 13-2p:

> The DAA materiality analysis as described in SSR 13-2p asks at step one whether the claimant has DAA. If yes, at step two the ALJ determines whether the claimant is disabled considering all the impairments, including DAA. If the answer is yes, the third step asks whether DAA is the only impairment. If the answer is yes, then DAA is material and the claim is denied. If no, [under the fourth step] the ALJ then asks whether the other impairments are "disabling by [themselves] while the claimant is dependent upon or abusing drugs or alcohol?" If the answer is no, then DAA is material and the claim is denied. If the answer is yes, then the ALJ proceeds to step five and asks whether DAA causes or affects the claimant's medically determinable impairments. If the answer is no, then DAA is not material and the claimant is found disabled. If the answer is "[y]es, but the other impairment(s) is irreversible or could not improve to the point of nondisability," then claimant is found to be disabled. If the answer is "[y]es, and DAA could be material," the ALJ then proceeds to a sixth step to determine whether the other impairments would "improve to the point of nondisability in the absence of DAA?" If the answer is yes, DAA is material and the claim is denied. If the answer is no, then the claimant is found to be disabled.

*Hundley*, 2016 WL 423548, at \*6. Although *Hundley* remanded, it did so for analysis of "whether Plaintiff's substance abuse was a *material factor* in determining disability under the analytical framework of SSR 13–2p." *Id.* at \*7 (emphasis added).

Here, again, the ALJ adequately addressed the issue of the materiality of Plaintiff's substance abuse. First, the ALJ found that Plaintiff experienced the severe impairments of a history of drug and alcohol abuse, depression, and substance induced mood disorder; this satisfies DAA step one and step three. The ALJ determined that Plaintiff's combined impairments, including those connected with drug and alcohol abuse, met listings 12.04 and 12.09; this satisfies DAA step two. Under the procedures in SSR 13-2p, the ALJ then determined that when Plaintiff's drug and alcohol abuse was removed from consideration, he continued to have a severe impairment, but his condition no longer met or equaled any listed impairment (R. 27); this satisfies DAA step four. Since the ALJ's answer at step four was "no" to whether Plaintiff's impairments were disabling by themselves while Plaintiff is dependent upon or abusing drugs or alcohol, under SSR 13-2p, Plaintiff's DAA is material and the ALJ properly denied Plaintiff's disability claim pursuant to that Regulation.

The ALJ did not need to proceed to steps five and six of the DAA analysis because SSR 13-2p specifically directs him not to. Plaintiff is mistaken that an analysis of improvement to the point of nondisability (step six) or requiring evidence in the case record of improvement (also step six) is necessary as part of the ALJ's step four DAA analysis. In fact, SSR 13-2p makes it clear that this is not so: at step four, "[w]hen the claimant's other impairment(s) is not disabling by itself…we do not require adjudicators to determine whether the other impairment would improve if the claimant stopped using drugs or alcohol he or she is dependent upon or abusing because DAA materiality is established without this additional analysis." 2013 WL 621536, at *6.

Turning to the ALJ's step four analysis in particular, the Court finds that the ALJ established a logical bridge between the evidence and his conclusions. At numerous points in his opinion, the ALJ noted that, to the extent there was evidence available about Plaintiff's functioning during times of relative sobriety, this evidence suggested Plaintiff's functioning improved. (R. 27-35). The ALJ noted that when abusing drugs and alcohol, Plaintiff regularly heard voices at night and during the day, yet the record reflected that he was merely agitated and irritable when off his medication; when not abusing drugs and alcohol, Plaintiff would still have some irritableness but his medications made him less upset. (R. 26, 28). The ALJ also noted that when sober and medicated, Plaintiff got better sleep and had fewer hallucinations, leading to better concentration, persistence, and pace. (R. 31). Lastly, the ALJ thoroughly discussed how Plaintiff's assertions about his reduced functioning even when sober were not credible, in particular noting the instances when medical personnel found Plaintiff to be non-cooperative or exerting less than full effort on examination, and pointing out that Plaintiff's mental health complaints were essentially nonexistent prior to the time his disability claim based on physical limitations was initially denied. (Tr. 28-30). The ALJ supported his conclusions with substantial evidence; even though reasonable minds might differ about these conclusions (*Elder*, 529 F.3d at 413), the Court cannot say that the ALJ's conclusions were illogical based on this evidence.

Therefore, as the ALJ properly concluded his DAA analysis under SSR 13-2p at step four, we

need not address Plaintiff's arguments dealing with whether Plaintiff's other medical impairments are caused by his DAA (dkt. 13, p. 10) or whether Plaintiff's functioning would improve in the absence of his DAA [*Id.* at p. 11].

In sum, we will not overturn the ALJ's decision on the basis of his DAA analysis.

### b. The ALJ Did Not Err in His Credibility Determination

Plaintiff next argues that the ALJ erred in assessing his subjective symptom statements and credibility, arguing in large part that it was error for the ALJ to focus on Plaintiff's lack of truthfulness about his substance use, instead asserting it "beside the point" if Plaintiff's testimony regarding substance abuse was not entirely accurate. (Dkt. 13, p. 12).

Social Security Regulation 96-7p, 1996 WL 374186 (July 2, 1996), applies to the ALJ's credibility determinations in the instant matter.[13] According to SSR 96-7p, "[i]n determining the credibility, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements, information provided by treating or examining physicians or psychologists or other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." 1996 WL 374186 at *1. SSR 96-7p goes on to say that a "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

An ALJ's findings about the reliability of a plaintiff's testimony and allegations regarding his

---

[13] In 2016, the Commissioner rescinded SSR 96-7p and issued SSR 16-3p, eliminating the use of the term "credibility" from the symptom evaluation process, but clarifying that the factors to be weighed in that process remain the same. *See* SSR 16-3p, 2016 WL 1119029, at *1, *7 (March 16, 2016). The ruling makes clear that ALJs "aren't in the business of impeaching claimants' character," but does not alter their duty to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). However, the Social Security Administration recently clarified that SSR 16-3p only applies when ALJs "make determinations on or after March 28, 2016," and that SSR 96-7p governs cases decided before the aforementioned date. *See* Notice of Social Security Ruling, 82 Fed. Reg. 49462, n. 27 (Oct. 25, 2017). Here, the ALJ issued his decision on September 25, 2015. (R. 37). Therefore, SSR 16-3p does not apply retroactively and the ALJ properly applied SSR 96-7p (as Plaintiff acknowledges at dkt 13, p. 11).

symptoms are entitled to great deference, and they should be upheld unless patently wrong. *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007). Reviewing courts examine whether a credibility determination was "reasoned and supported…It is only when the ALJ's determination lacks any explanation or support that we will declare it to be '"patently wrong,"' and deserving of reversal. *Elder*, 529 F.3d at 413-14 (citation omitted). An ALJ complies with SSR 96-7p (and 16-3p), and the court will affirm his finding, so long as he "gives specific reasons that are supported by the record." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

Here, the ALJ properly considered the factors set forth above and provided specific and well-supported reasons (12 single-spaced pages worth) for his conclusions with respect to Plaintiff's subjective assertions about both his substance use and his symptoms. The ALJ was particularly concerned about the context and timing of Plaintiff's assertions, particularly since Plaintiff's mental health complaints only started after his disability claim based on physical ailments was denied. *See Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (noting that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). The ALJ noted that a mental status examination conducted by Dr. Palacci in January 2013 before Plaintiff's initial denial was normal. (R. 21). Also with respect to the curious timing of Plaintiff's complaints, the ALJ noted that Plaintiff complained of worsening mental health symptoms when he presented his disability forms to his treating psychiatrist, who did not observe any worsening behavior or appearance at that time. (R. 23). The ALJ also found troublesome the fact that Plaintiff "had an agenda and was only fairly cooperative in responding to questions during examination" when he was examined by the consultative examiner Dr. Langgut. *Id.*

Aside from these contextually problematic events, the ALJ also considered the multiple inconsistencies in Plaintiff's reports of drug and alcohol abuse and his medical history, all of which are integral to an ALJ's evaluation of a claimant's symptoms. It is certainly not "beside the point" that the ALJ found Plaintiff's reports of substance use inconsistent. Rather, whether plaintiff accurately

reported what substances he was using while experiencing symptoms was crucial to the ALJ's determination of whether his substance abuse was material to his disability. *See* 20 C.F.R. § 416.929(c)(4) ("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence."). Apart from the inconsistencies the Court has detailed in its recitation of the ALJ's opinion in Section I(b), *supra*, we specifically note here that the ALJ found that Plaintiff minimized his substance abuse at the administrative hearing, presenting a far different picture than the intensive and prolonged use indicated by the medical evidence.[14] (R. 32, 34). We also note that the ALJ emphasized that when Plaintiff first reported his mental symptoms, he admitted they occur "mostly when he drinks." (R. 32).

As to the inconsistencies in Plaintiff's reported substance abuse, the Commissioner is correct that "[i]n cases where DAA is not at issue, statements related to drug use may be irrelevant to the issue of disability and therefore not a proper basis for an ALJ's conclusions regarding reliability. Here, however, an accurate representation of [P]laintiff's drug and alcohol abuse was critical to the question of whether he qualified for benefits." (Dkt. 18, p. 9). The Court does not find the ALJ's explanations for his credibility determinations to be gratuitous or impermissible attacks on Plaintiff's character as Plaintiff suggests. (Dkt. 13, p. 12). Rather, the ALJ appropriately considered the reliability of Plaintiff's statements concerning his substance abuse in comparison to concurrent medical records concerning the same; the ALJ found Plaintiff's statements unreliable as to his drug and alcohol use and described why, with reference to the evidence he relied upon in reaching this conclusion. Additionally, the Court is satisfied that the ALJ's discussion of an unreliable Plaintiff's continued allegations of pain, despite not a single objective verification of impairment, is sound.

Here, the ALJ gave specific reasons that are supported by the record for his credibility findings.

---

[14] Plaintiff testified he previously used street drugs once or twice per week, and no longer used any drugs. (R. 75-76; *see also* 570 (reporting cessation of illegal drugs in 2012)). However, the ALJ noted the medical records indicated that Plaintiff used drugs more frequently and more recently than he testified. (R. 32; 634 (reported in June 2014 using marijuana three days per week and crack "occasional[ly]"); 641 (same in March 2014); 647 (same in December 2013); 653 (same in October 2013); 659 (same in August 2013); and 665 (same in July 2013)).

*Skarbek*, 390 F.3d at 505. "Not all of the ALJ's reasons must be valid as long as *enough* of them are." *Halsell v. Astrue*, 357 Fed.Appx. at 722-23 (emphasis in original). The Court is satisfied with the ALJ's analysis and reasoning therefore, and finds that the ALJ's conclusions regarding Plaintiff's subjective symptom statements and credibility are supported by substantial evidence. Therefore, the ALJ's credibility assessment is not patently wrong, and we will not reverse it. *See Elder*, 529 F.3d at 413-14.

### c. The ALJ Appropriately Considered the Opinions of Dr. Ngorima

Next, Plaintiff contends that the ALJ erred in failing to defer to treating physician Dr. Ngorima's opinions. Because of a treating physician's greater familiarity with the claimant's condition and the progression of his impairments, the opinion of a claimant's treating physician is entitled to controlling weight as long as it is supported by medical findings and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(c)(2); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *Clifford v. Apfel*, 227 F.3d at 870. An ALJ may discount a treating physician's medical opinion if it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt*, 496 F.3d at 842 (signals and citation omitted).

Here, the ALJ assigned Dr. Ngorima's opinions good weight in connection with Plaintiff's condition while abusing substances, and, consistent with Dr. Ngorima's opinions, found that Plaintiff met a listed impairment and was therefore disabled when using drugs and alcohol. (R. 27). The ALJ assigned little weight to the opinions, however, in connection with Plaintiff's functioning when he was not abusing drugs or alcohol because the ALJ found that Dr. Ngorima based her opinions on Plaintiff's unreliable assertions that he was no longer using alcohol or drugs, as well as Plaintiff's unreliable assertions about his symptoms (Plaintiff's unreliability has already been addressed, *supra*). (R. 34).

The explanation that the ALJ gave for giving more weight to some parts of Dr. Ngorima's opinions than to other parts is that Dr. Ngorima's opinions can be relied upon when she believes Plaintiff is using substances, but that those opinions where she relies on his self-reported non-use were

made in reliance on his *unreliable* statements concerning abstinence. (R. 26, 34). Thus, the ALJ gave Dr. Ngorima's opinions during times of Plaintiff's acknowledged substance abuse good weight as these opinions "can be considered to address his functioning in conjunction with ongoing substance abuse." The ALJ then gave "slight weight" to Dr. Ngorima's opinions regarding Plaintiff's functioning in the absence of substance use, and detailed his reasons for doing so. (R. 34). Those reasons are:

> The longitudinal record does not detail credible substance absence from [Plaintiff] during periods of increased symptomology suggested by Dr. Ngorima. Although there are periods in which substance abuse is not reflected and [Plaintiff's] functioning is improved, suggestions of hallucinations and psychosis occur in conjunction with extended substance use (and in the absence of demonstrated abstinence). Dr. Ngorima wrote a report on March 10, 2014 essentially reciting inability on the part of [Plaintiff] to carry out mental abilities to sustain work in social interaction/ability to sustain work with a consistent GAF of 45. On the issue of substance abuse, the doctor indicates, "The patient was drinking daily as per history provided at the time of his intake. However his mood and psychotic symptoms are in excess of alcohol intake." I disagree.[15] The record does not support that statement but, in fact, contradicts that statement. First, I do not deem the mood and psychotic symptoms that he reported to be beyond the quantity of alcohol and drugs that he ingested. As stated above, [Plaintiff] continued to report high-end ingestion of drugs and alcohol until August 2014 (and thereafter asks that we presume that he essentially went cold turkey without assistance). This is not credible. Second, Dr. Ngorima is essentially taking [Plaintiff] at his word with regard to his alleged symptoms under treatment. These reported symptoms are obtained in the context of [Plaintiff] pursuing his disability claim. As detailed herein, the many inconsistent statements and presentations of the [Plaintiff] call into question his credibility. I do not take [Plaintiff] at his word, based on the longitudinal record. For example, he alleged significant physical complaints yet, as Dr. McKenna pointed out, there was no medical basis for his extreme physical complaints of pain and weakness. Notably, [Plaintiff] allegations of psychotic thoughts are his self-report, and there exists reason to doubt the otherwise uncorroborated statements of [Plaintiff]. But given that these allegations are primarily in the context of rampant daily ingestion of street drugs and alcohol, the GAF score of 45 is given good weight only as it pertains only to [Plaintiff] functioning in conjunction with substance use. Otherwise, the GAF scores suggested by Dr. Ngorima are not consistent with the longitudinal record. The doctor's GAF scores rely on the non-credible statements of [Plaintiff].[16]

*Id.* (internal Record citations omitted). Additionally, the ALJ further called into question Dr. Ngorima's

---

[15]    As to the ALJ's "I disagree" statement, the Court does not believe the ALJ was impermissibly playing doctor. This is merely a statement followed by an explanation from the ALJ regarding exactly *why* Plaintiff's medical records contradict Dr. Ngorima's notation, where the ALJ then provided two specific reasons for the same. At most, this is a harmless error no different than if the ALJ had removed "I disagree" from his opinion or had phrased the explanation "I disagree because the record does not support…" We can predict with great confidence that the result on remand would elicit the same *explanations* for the ALJ's disagreements with Dr. Ngorima's opinions if he were told to remove the "I disagree" statement from his decision. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (an ALJ's error is harmless if the court "can predict with great confidence that the result on remand would be the same").

[16]    The ALJ also points out that this GAF score was never reassessed by Dr. Ngorima. (R. 22).

opinions made during the time when Plaintiff self-reports reduced substance use as follows:

> I note that by April 20, 2015 [Plaintiff] is apparently still reporting drinking one to two beers twice weekly. Yet [he] acknowledges continued occasional withdrawal symptoms. Dr. Ngorima does not question [Plaintiff] as to how he continues to experience withdrawal symptoms while reporting such minimal alcohol use and deny drug use for an extended period. Her failure to inquire/question the statements made by [Plaintiff] calls into question her reliance on his statement regarding substance abstinence and symptoms in excess of his substance use.

(R. 33).

Therefore, based on the foregoing reasoning, the Court does not find it in error for the ALJ to have determined that Dr. Ngorima's records did not accurately reflect Plaintiff's functioning in the absence of substances due to Plaintiff's unreliable reporting of his substance abuse to Dr. Ngorima. *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir.1995) (ALJ may disregard medical opinion premised on claimant's self-reported symptoms if ALJ has reason to doubt claimant's credibility); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (if treating physician's opinion is based solely on patient's subjective complaints, the ALJ may discount it); *see also, Moody v. Astrue*, 2010 WL 358536, at *7 (C.D. Cal. Jan. 25, 2010) (ALJ reasonably inferred from lack of diagnosis of substance abuse that treating physician was unaware of extent of plaintiff's substance abuse and effects on his ability to function without same, particularly because plaintiff had not been candid with treater about magnitude of usage). Because the ALJ properly found that Plaintiff was not entirely credible, it follows that he could reject a medical opinion based on those unreliable reports. *See Ziegler v. Astrue*, 576 F. Supp. 2d 982, 998 (W.D. Wis. 2008), aff'd, 336 F. App'x 563 (7th Cir. 2009) (citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Mastro v. Apfel*, 270 F.3d 171, 177-78 (4th Cir. 2001); and *Morgan v. Commissioner of the Social Security Administration*, 169 F.3d 595, 602 (9th Cir. 1999)).

Finally, Dr. Ngorima's opinions about the extent of Plaintiff's mental illness in the absence of drinking are also undercut by the opinion of consulting physician Dr. Langgut, whose "diagnosis reflects substance related conditions/restrictions." (R. 27). In fact, *all* of Plaintiff's diagnoses made by Dr. Langgut, including the mood disorder diagnosis, were, as noted by the ALJ, connected to Plaintiff's

substance use (*i.e.*, "Alcohol Abuse - in recent remission; Polysubstance Abuse - in recent remission; and *Substance-Induced Mood Disorder*, N.O.S.") (R. 24) (emphasis added). Thus the ALJ has also articulated how Dr. Ngorima's opinions are inconsistent with the opinion of a consulting physician. *See Schmidt*, 496 F.3d at 842.

The ALJ has more than satisfied the "minimal articulation" standard an ALJ must abide by when rejecting a treating physician's medical opinion. *Id.* The Court is able to find a logical and accurate bridge from the evidence to the ALJ's conclusions about Dr. Ngorima's opinions. Therefore, because the ALJ reasonably found that substantial evidence existed for his conclusions and thoroughly articulated the same, the Court will not overturn his decisions to accept and reject certain medical opinions or portions thereof.

### d. The ALJ Did Not Err in His RFC Assessment

Finally, Plaintiff argues that the ALJ erred in his RFC assessment. Although this short section of Plaintiff's initial brief is not very clear, it seems Plaintiff makes three complaints about the ALJ's RFC determination: 1) the ALJ erred by failing to include an assessment of his non-severe ailments in concert with one another; 2) the ALJ erroneously found that Plaintiff would be off task for no more than 90% of the workday; and 3) the ALJ failed to adopt the mental limitations opined by Dr. Ngorima.

#### 1. Plaintiff's Non-Severe Ailments

Plaintiff is correct that case law typically requires the ALJ to consider a claimant's non-severe impairments in concert with each other and claimant's other impairments to determine their collective effect on one's ability to work. *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). Here, however, Plaintiff has not even identified which of Plaintiff's alleged "multiple medically determinable physical impairments" (dkt. 13, p. 15) the ALJ should have considered, nor has Plaintiff identified any medical evidence that would support any limitations related to these impairments. Plaintiff likewise fails to address this issue in the two sentences of his reply brief he spends on the ALJ's RFC analysis (the first sentence of which refers the Court back to his initial memorandum). (Dkt. 19, pp. 3-4).

On this point, the Commissioner's arguments are persuasive that the ALJ sufficiently considered the evidence related to Plaintiff's physical complaints and concluded that no limitations were proven and, thus, did not include any physical limitations in Plaintiff's RFC. For example, the ALJ noted normal imaging studies, which undermined Plaintiff's allegations of limitations. (R. 20; 436 (normal cervical spine x-ray); 437 (normal knee x-rays); 484 (negative CT scan, negative neck x-ray); 592-93 (only mild degenerative changes in left knee and lumbar spine). The ALJ also noted that Plaintiff reported numerous physical complaints to various doctors, but that his examinations generally demonstrated full muscle strength and no loss of sensation. (R. 21, 423 (recorded 4/5 grip strength "due to poor effort," full strength in all other muscle groups, no loss of sensation, normal gait); 461 (good grip strength and normal sensory exam despite claims of numbness in wrist); 480 (negative CT scan, good grip strength despite complaints); 585-88 (largely normal musculoskeletal exam with some reduced range of motion). Similarly, the ALJ found that Plaintiff's alleged cardiac issues and asthma were unsupported by medical evidence (and the ALJ noted that Plaintiff gave poor effort on his pulmonary function test). (R. 20-21, 31). Similarly, the ALJ noted that despite reporting left sided hemiparesis to treaters, Plaintiff testified at the administrative hearing that he suffered no consequences from his stroke, and Dr. Palacci's clinical impression was that Plaintiff had a history of stroke with no residual weakness. (R. 20, 21, 30, 76-68, 70).

While the ALJ must consider "all limitations *supported by medical evidence in the record*," when posing hypothetical questions to the VE to assist in formulating an RFC, here the ALJ reasonably concluded the evidence did not support the inclusion of any physical limitations in Plaintiff's ultimate RFC. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (emphasis added); *see also Steele*, 290 F.3d at 942 (same); *Loveless*, 810 F.3d at 507 (explaining that subjective complaints, followed by negative medical findings, do not substantiate limitation). The Court is at a loss in even determining any medically supported physical limitation Plaintiff believes the ALJ should have included in his RFC. The Plaintiff has failed to carry his burden of demonstrating harmful error on this point.

### 2. Off Task for No More Than 90% of the Workday

Next, Plaintiff asserts that the ALJ had no basis for his determination that Plaintiff could maintain concentration and stay on task for 90% of the workday. However, Plaintiff ignores the ALJ's extremely specific explanation for that determination. Although the Court recited the ALJ's reasoning in Section I(b), *supra*, we set forth that reasoning again in full below because it is crucial to understanding how the ALJ arrived at this 90% figure. Specifically, the ALJ detailed his reasoning for finding Plaintiff able to maintain on-task productivity for at least 90% of the workday as follows:

> By definition "marked" means "more than moderate but less than extreme". A marked limitation may arise when several activities or functions are impaired or even when only one activity is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. A moderate limitation in concentration, persistence or pace does not preclude work on a full-time, competitive basis. On the other hand, a marked limitation in concentration, persistence or pace does preclude work on a full-time, competitive basis. The vocational expert at hearing indicated that, in vocational terms, more than a residual of 85% concentration, persistence or pace for the workday does not preclude work on a full-time competitive basis and that less than a residual of 85% concentration, persistence or pace for the workday does preclude work on a full-time, competitive basis. I am finding that the [Plaintiff] has a moderate limitation in concentration, persistence or pace, and, therefore, I articulated to the vocational expert witness that [he] is able to maintain concentration leading to on task productivity 90% or more of the workday in the residual functional capacity hypothetical to reflect that residual capacity in vocational terms.

(R. 35).

As the ALJ explained, Plaintiff had moderate difficulty concentrating – a level of difficulty that was less severe than marked because the Plaintiff did not meet the marked difficulty standard of having several activities or functions impaired to a degree that they seriously interfered with Plaintiff's ability to function independently. (R. 28, 35). Marked difficulty in concentration, the ALJ explained, would preclude full time employment. (R. 35). The VE testified that concentration less than 85% of the workday would be work preclusive. (R. 35, 95). Therefore, the ALJ reasonably concluded that a marked difficulty with concentration would equate to being on task 85% or less of the workday. (R. 35). The ALJ then extrapolated from that conclusion that a moderate limitation would equate to the ability to concentrate for 90% of the workday. *Id.*

Plaintiff cites no case law for the proposition that this type of analysis (where the ALJ relied on the medical evidence to determine Plaintiff's level of limitation in concentration and then, in reliance on the VE's testimony concerning the same, came to a percentage figure representing this limitation) is improper. The Court has found none either. The Court is able to follow the logical bridge the ALJ has set forth from the evidence to his conclusion with respect to the 90% productivity figure. *Steele*, 290 F.3d at 941. Even though reasonable minds may differ as to the ALJ's methodology or conclusion, the Court finds it supported by substantial evidence and not in error according to any precedent.

### 3. Dr. Ngorima's Limitations

Lastly, Plaintiff complains about the mental limitations within the RFC. These complaints appear to be an argument that the ALJ did not adopt the limitations opined by Dr. Ngorima (although Plaintiff does not specify which "treating doctor's reports" he means). (Dkt. 13, pp. 15-16). As the Court has discussed thoroughly elsewhere in this opinion, the ALJ appropriately determined that Dr. Ngorima's opinions did not reflect Plaintiff's abilities while sober. Thus, although the ALJ's RFC may be inconsistent with Dr. Ngorima's reports, Plaintiff's arguments do not provide a basis for remand.

For the reasons above, the Court concludes that the ALJ's RFC determination is supported by substantial evidence and will not overturn the ALJ's decision on this basis.

### CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Summary Judgment (dkt 17) is granted and Plaintiff's motion (dkt 12) is denied. The final decision of the Commissioner is affirmed.


Entered: 5/16/2018

_____

U.S. Magistrate Judge, Susan E. Cox